**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | |
|---|---|
| CHRISTOPHER D. JOHNSON, <br><br> Plaintiff, <br><br> v. <br><br> TRANS UNION LLC and EQUIFAX INFORMATION SERVICES, LLC, <br><br> Defendants. | Civil Action No.: <br><br><br> **COMPLAINT AND DEMAND FOR JURY TRIAL** |

## COMPLAINT

Christopher D. Johnson ("Plaintiff" or "Mr. Johnson") a living, breathing 57-year-old consumer, brings this action on an individual basis, against Defendant Equifax Information Services, LLC ("Defendant Equifax" or "Equifax") and Trans Union, LLC ("Trans Union") (collectively, the "Defendants") and states as follows:

## INTRODUCTION

1. The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2. However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage,

1

both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, the Defendants acknowledge this potential for misuse and resulting damage every time they sell their respective credit monitoring services to a consumer.

3.    The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4.    These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

5.    Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

6.    One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

*See* 15 U.S.C. § 1681(a)(1).

7.    The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 cong. Rec.

36570 (1970)] (emphasis added).

8.    The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or her credit and obtaining new credit.

9.    In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U. S.C. § 1681(a)(4).

10.    The FCRA also requires furnishers of information, a creditor or other third party that provides information about consumer to a CRA, upon notice, to conduct a reasonable reinvestigation of all disputes with regard to the completeness or accuracy of any information it provides to the CRAs regarding a consumer and modify, delete, or permanently block any items of information found to be inaccurate, incomplete, or unverifiable after said reinvestigation is completed.

11.    Plaintiff's claims arise out of the Defendants' blatantly inaccurate credit reporting, wherein Defendants Equifax and Trans Union reported to Plaintiff's potential creditors that he is "deceased" and does not have a credit score.

12.    The Defendants each communicated to one or more third parties that Plaintiff's name, date of birth, address, and Social Security number were associated with that of a deceased person, which was intended to communicate a high risk of fraud.

13.    Accordingly, Plaintiff brings claims against Defendants Equifax and Trans Union for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiffs credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b).

14.    As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs and attorneys' fees from the Defendants for their willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq*., as described herein.

## PARTIES

15.    Christopher D. Johnson ("Plaintiff" or "Mr. Johnson") is a natural person residing in Fort Worth, Texas, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

16.    Defendant Equifax Information Services, LLC ("Defendant Equifax" or "Equifax") is a limited liability company with a principal place of business located at 1550 Peachtree Street, N.W., Atlanta, Georgia 30309, and is authorized to do business in the State of Texas, including within this District.

17.    Equifax is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Equifax is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

18.    Defendant Trans Union, LLC ("Defendant Trans Union" or "Trans Union") is a limited liability company with a principal place of business located at 555 W Adams Street, Chicago, IL 60661, and is authorized to do business in the State of Texas, including within this District.

19.    Trans Union is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Trans Union is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

## JURISDICTION AND VENUE

20.    This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

21.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## FACTS
### Summary of the Fair Credit Reporting Act

22.    The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

23.    The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. *See* 15 U.S.C. § 1681(a).

24.     Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information. *See* 15 U.S.C. § 1681(b).

25.     To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. § 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. § 1681i).

26.     The FCRA provides consumers with a private right of action against consumer reporting agencies that willfully or negligently fail to comply with their statutory obligations under the FCRA.

**The Defendants' Practices Concerning the Sale of Reports on the "Deceased"**

27.     The Defendants sell millions of consumer reports (often called "credit reports" or "reports") per day, and also sell credit scores.

28.     Pursuant to 15 U.S.C. § 1681e(b), consumer reporting agencies, like the Defendants, are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

29.     Pursuant to 15 U.S.C. §§ 1681b and 1681e(a), consumer reporting agencies, like the Defendants, must maintain reasonable procedures to assure that consumer reports are sold only for legitimate 'permissible purposes."

30.     The Defendants routinely place a "deceased" notation or marking on reports when it is advised by any of its many data furnishing sources (such as banks, debt collectors, etc.) that a given consumer is deceased.

31.     The Defendants' furnishing sources identify "deceased" consumers by marking the "status" of such consumer's responsibility for any subject account with an "X" or "U/UNDESIGNATED" code in the "ECOA" field of an electronic data input format used in the credit reporting industry, known as Metro or Metro 2.

32.     The Defendants do not request or require a death certificate from any of their data sources which advise that a consumer is "deceased" before placing a "deceased" mark in that consumer's credit file.

33.     The Defendants do not request or require any proof from any data source which advises that a consumer is "deceased," showing that the consumer is in fact deceased before placing a "deceased" mark on that consumer's report.

34.     The Defendants do not independently verify with any source that a consumer is in fact deceased before placing a "deceased" mark on that consumer's report.

35.     In some cases, in order to assure accuracy, the Defendants may send letters and/or other communications to consumers when certain information that may be considered suspicious or unreliable is furnished about said consumers to be placed in their credit files, such as in cases where consumers have a freeze or fraud alert on their credit report, or in accordance with certain state laws, such as the consumer laws of Colorado. The Defendants do not have any procedure to notify consumers (such as a next of kin or executor or administrator of the consumer's estate) when an "X" or "U/UNDESIGNATED" deceased code is furnished to them to be placed in said consumer's credit file or report.

36.     The Social Security Administration (SSA) maintains the **Death Master File ("DMF")**.  The DMF is also known commercially as the Social Security Death Index (SSDI).  The SSA's DMF as of 2018 contained information on 111 million deaths that have been reported to the SSA.  The DMF is created from internal SSA records of deceased persons possessing social security numbers and whose deaths were reported to the SSA.  The DMF includes the following information on each decedent, if the data are available to the SSA: social security number, name, date of birth, and date of death.

37.     Legislation (i.e., the Social Security Act) precludes the sharing of the full DMF with non-benefits paying agencies.

38.     Because of the wide use and demand for death records for a variety of industries, SSA has partnered with the U.S. Department of Commerce's National Technical Information Service (NTIS) to release the **Limited Access Death Master File (LADMF)** electronically on a weekly and monthly basis.

39.     The SSA receives death reports from many sources, including family members, funeral homes, financial institutions, postal authorities, state information, and other federal agencies.  The SSA does not have a death record for all persons; therefore, the SSA does not guarantee the veracity of the DMF.  The SSA does not guarantee 100% of the data.

40.     The SSA estimates that roughly 12,000 living people are added to the DMF annually, potentially due to clerical error. An erroneous listing can lead to not only a cessation of

government benefits, but also the freezing of bank accounts, the inability to buy or rent property, and mistaken accusations of identity theft.[1][2]

41.    The Office of the Inspector General called the error rate "very low," but noted that "SSA's erroneous death entries can lead to mistaken benefit terminations and cause severe financial hardship and distress to affected people…when errors like this occur, it can be a long and difficult process to resurrect your financial health.[3]

42.    The Defendants do not have access to the full DMF from the SSA, but rather are subscribers to the NTIS LADMF.

43.    Despite being subscribers of the NTIS LADMF, the Defendants do not cross-reference the "X", or "U/UNDESIGNATED" code received from data furnishers with the LADMF in order to determine whether any given consumer reported as deceased via a furnishing source is also on the LADMF *before* selling a credit report about said consumer, or at any time.

44.    The Defendants will only cross-reference the NTIS LADMF to sell additional products for an additional fee to their subscribers regarding information contained within the LADMF.

45.    The Defendants fail to employ reasonable procedures that assure that a consumer is actually deceased before placing the "deceased" mark on that consumer's report and selling that report for profit.

---

[1] *Aviva Dekornfeld (2018-06-20). "The Plight of the Living Dead". The Indicator from Planet Money (Podcast).*
[2] Bichell, Rae Ellen (2016-08-10). "Social Security Data Errors Can Turn People into the Living Dead". *National Public Radio*.
[3] "Cases of Mistaken Death Reports Low but Costly | Office of the Inspector General, SSA". *oig.ssa.gov*. 2016-03-24. Archived from the original on 2020-07-16.

46.    Even in instances where other data on the face of the consumer's report indicates that he/she is not deceased, the Defendants do not employ any procedures to assure that a consumer is in fact actually deceased before placing the "deceased" mark in that consumer's file.

47.    Even in instances where the purportedly deceased consumer communicates directly with the Defendants, the Defendants do not employ any procedures to assure that a consumer is in fact actually deceased before placing the "deceased" mark on that consumer's report.

48.    Once a "deceased" mark is placed upon a consumer's report, the Defendants will not calculate and will not provide a credit score for that consumer.

49.    Upon the Defendants' reports with a "deceased" mark sold to third parties, the Defendants never calculate or provide a credit score for that consumer and instead report that consumer's credit score as "N/A."

50.    The Defendants know that third party credit issuers require a credit score in order to process a given credit application.

51.    The Defendants know that consumers without credit scores are unable to secure any credit from most credit issuers.

52.    The Defendants know that living consumers are routinely turned down for credit specifically because they are reporting them as "deceased" and without a credit score.

53.    The Defendants have been put on notice for years through consumer disputes and lawsuits that living, breathing consumers are turned down for credit specifically because the Defendants are inaccurately reporting them as "deceased" and without a credit score.

54.    The Defendants have received and documented many disputes from consumers complaining that Defendants had erroneously marked them as "deceased" on their credit reports.

55.     The Defendants know that thousands of consumers are erroneously marked as "deceased" on their credit reports via an erroneous furnishing of the "X" or "U/UNDESIGNATED" code.

56.     Nevertheless, the Defendants do not employ any procedures to assure that a consumer is actually deceased before adding a "deceased" notation to that consumer's credit file and credit reports.

57.     Even consumers who dispute the erroneous "deceased" status on their credit reports continue to be erroneously marked as deceased unless the furnishing source which provided the erroneous "X" or "U/UNDESIGNATED" code in the first instance modifies its reporting first.

58.     The Defendants do not have any independent procedure to change an erroneous deceased status on their own and will merely parrot their furnishing source in the case of a reinvestigation into the accuracy of the deceased status upon a consumer's report, a reinvestigation which is triggered by a consumer dispute.

59.     Nor do the Defendants employ any procedures to limit or stop the furnishing of reports to third parties for consumers that they have marked as "deceased" under any circumstances.

60.     For years after a consumer's actual death, the Defendants will continue to sell credit reports about that consumer.

61.     The Defendants will only remove a deceased consumer's file from their respective credit reporting databases when it is no longer valuable to them—meaning that no one is continuing to purchase reports about that consumer.

62.     The Defendants charge third parties a fee for reports with a mark that a consumer is deceased ("reports on the deceased") as they would for any other report.

63.     The Defendants profit from the sale of reports on deceased consumers.

64.     The Defendants have in their respective credit reporting databases many "deceased" tradelines corresponding to distinct credit files for individual consumers that they have marked as "deceased."

65.     The Defendants know that truly deceased consumers do not apply for credit.

66.     The Defendants know that the credit information and reports of truly deceased persons are used by criminals to commit identity theft or credit fraud. Indeed, identity theft using the personal identifying information of deceased consumers is known to the Defendants to be a common and major source of identity theft.

67.     The Defendants know that identity theft and credit fraud are serious and widespread problems in our society.

68.     The Defendants warn the relatives of truly deceased consumers that identity theft can be committed using the credit reports and information of the deceased and require relatives to provide a death certificate or executorship papers, among other forms of proof, before accessing the deceased consumer's credit information or report.

69.     The Defendants have no similar death certificate, executorship paper, or any other proof requirements for their data sources, which report a consumer as deceased or for the purchasers of their reports who access the purportedly deceased consumer's information.

70.     The Defendants sell reports on supposedly deceased consumers to third parties in an automated fashion and without any specific or general certification that could reasonably explain a "permissible purpose" for purchasing or using a (supposedly) deceased consumer's credit history and/or report.

71.    For consumers who are deceased, there rarely, if ever, exists a permissible purpose under the FCRA for the Defendants to sell their credit reports, absent a court order.

72.    The Defendants know that such reports contain a vast amount of personal identifying and credit account information on the supposedly deceased consumer, information that can be used to commit identity theft or for other fraudulent purposes.

**Plaintiff Applies for a Credit Card with Capital One**

73.    On or about March 12, 2024, Plaintiff decided to apply for a credit card with Capital One.

74.    Plaintiff hoped to use the credit card to build his credit and to support himself.

75.    As a part of his application, Plaintiff provided Capital One with his personal identification information, including his Social Security number, and gave Capital One permission to order his credit reports and/or credit scores in order to determine his eligibility for credit.

76.    Plaintiff did not anticipate any issues with his credit application.

**Capital One Denies Plaintiff's Credit Application**

77.    Shortly after applying, Plaintiff's application was denied.

78.    The denial letter stated that Plaintiff was denied because "one or more of the agencies on this back of this letter reported applicant as deceased."

79.    Plaintiff did not see the reasons for the denial at the time. Accordingly, Plaintiff was unaware that he was being reported as deceased.

80.    Defendants published Plaintiff's consumer report and/or credit score (or lack thereof) to Capital One.

81.    Defendants inaccurately reported that Plaintiff was deceased and/or lacked a credit score.

82.     Upon information and belief, Plaintiff would have been more likely to have been approved by Capital One had Defendants not reported that Plaintiff was deceased and/or lacked a credit score.

83.     Defendants violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy of the credit information they each published and maintained concerning Plaintiff.

**Plaintiff Applies for Insurance With Root Insurance, Homesite Group, and Liberty Mutual**

84.     In or around April or May 2024, Plaintiff was looking into getting new insurance for his properties.

85.     Plaintiff was also interested in potentially bundling his auto, homeowner's, and renter's insurance to save money.

86.     On or about May 1, 2024, Plaintiff submitted insurance applications to Root Insurance, Homesite Group, and Liberty Mutual (collectively, the "Insurance Companies").

87.     As a part of his applications, Plaintiff provided the Insurance Companies with his personal identification information, including his Social Security number, and gave the Insurance Companies permission to order his credit reports and/or credit scores in order to determine his eligibility for insurance.

**Plaintiff's Insurance Applications are Denied**

88.     Shortly after submitting his insurance applications, Plaintiff learned that he was denied by the Insurance Companies.

89.     At the time, Plaintiff was unaware of the reason for the denials.

90.     Upon information and belief, the Insurance Companies denied Plaintiff's applications as a direct result of the inaccurate information reported by Trans Union.

91.     Trans Union published Plaintiff's consumer report and/or credit score (or lack thereof) to the Insurance Companies.

92.     Trans Union inaccurately reported that Plaintiff was deceased and/or lacked a credit score.

93.     Upon information and belief, Plaintiff would have been more likely to have been approved by the Insurance Companies had Trans Union not reported that Plaintiff was deceased and/or lacked a credit score.

94.     Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

### Plaintiff Applies for Credit with Cadence Bank

95.     In or around May 2024, Plaintiff applied to open a secured credit account with Cadence Bank.

96.     As a part of this process, Plaintiff provided Cadence Bank with his personal identification information, including his Social Security number, and gave Cadence Bank permission to order his credit reports and/or credit scores in order to determine his eligibility for credit.

97.     A few days after submitting his loan application, a representative of Cadence Bank informed Plaintiff that he needed to come into the bank with his driver's license because there was something wrong with his application.

98.     Plaintiff was incredibly anxious about the status of his application.

99.     Plaintiff feared that he may be wrongfully arrested at Cadence Bank because they mistakenly thought he was committing some type of fraud.

15

100.    However, Plaintiff visited Cadence Bank and brought the required identification.

101.    Once at Cadence Bank, Plaintiff discussed applying for a home equity loan so he could finish construction on his recently purchased property with the bank representative.

102.    Plaintiff was eager to receive this loan because, without proper funds, his new home could not be finished and would just remain inhabitable, only generating additional expenses for Plaintiff.

103.    However, the bank representative informed Plaintiff that he was being reported as deceased on his Trans Union report.

104.    Consequently, Cadence Bank informed Plaintiff that while he could open his secured credit account, there was no chance that an application for a home equity loan would be approved as a direct result of the deceased notation reported by Trans Union.

105.    Trans Union published Plaintiff's consumer report and/or credit score (or lack thereof) to Cadence Bank.

106.    Trans Union inaccurately reported that Plaintiff was deceased and/or lacked a credit score.

107.    Upon information and belief, Plaintiff would have been more likely to have been approved by Cadence Bank for a home equity loan had Trans Union not reported that Plaintiff was deceased and/or lacked a credit score.

108.    Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

/ /

**Plaintiff Obtains His Credit Reports and Confirms the Deceased Notation on His Credit Files**

109.    On or about August 1, 2024, Plaintiff called the Social Security Administration ("SSA") to check if it was reporting him as deceased.

110.    An SSA representative confirmed that it was not reporting Plaintiff as deceased.

111.    On or about August 3, 2024, Plaintiff viewed a copy of his Equifax, Trans Union, and non-party Experian credit files.

112.    Upon review, Plaintiff saw that there was a deceased notation on his Equifax and Trans Union credit files.

113.    Specifically, Defendants were reporting that Plaintiff was deceased within four tradelines each.

114.    On or about September 18, 2024, Plaintiff once again reviewed a copy of his Equifax, Trans Union, and non-party Experian files.

115.    Plaintiff was shocked to discover that Defendants were now both reporting he was deceased in his American Express tradelines.

116.    Equifax violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

117.    Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

118.    As a result of the "deceased" notations, the Defendants made it practically impossible for Plaintiff to obtain credit.

119.    Upon information and belief, Defendants published the inaccurate deceased notations and/or that Plaintiff allegedly did not have a credit score to one or more other prospective creditors, causing additional harm.

120.    Upon information and belief, Defendants published the inaccurate deceased notations and/or that Plaintiff allegedly did not have a credit score to one or more of Plaintiff's current creditors.

121.    At all times pertinent hereto, Defendants were acting by and through their agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendants herein.

122.    At all times pertinent hereto, the conduct of Defendants, as well as that of their respective agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

123.    The Defendants are aware of the shortcomings of their procedures and intentionally choose not to comply with the FCRA to lower their costs.  Accordingly, the Defendants' violations of the FCRA are willful.

124.    As a result of Defendants' conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; physical distress; sleepless nights; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

125.    Specifically, Plaintiff feared that individuals/businesses believed he was engaged in fraudulent behavior, such as using the SSN of a deceased person. Plaintiff was afraid he may be wrongfully arrested for allegedly committing some type of fraud.

126.    Further, Plaintiff feared that someone may have stolen his identity.

127.    Plaintiff has also refrained from seeking additional credit out of sheer fear that the Defendants will continue to publish the inaccurate deceased notations and cause additional harm.

128.    Plaintiff has suffered from significant anxiety, stress, frustration, and embarrassment as a result of Defendants' conduct. Accordingly, Plaintiff is distracted all day and night and suffering from sleepless nights, high blood pressure, and dizziness.

129.    In addition, Defendants' conduct has caused Plaintiff to fear that he may not be able to support himself or pay his share of the bills.

## CLAIMS FOR RELIEF

### COUNT I
### 15 U.S.C. § 1681e(b)
### Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy
### (First Claim for Relief Against Defendants Equifax and Trans Union)

130.    Plaintiff re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs as if fully stated herein.

131.    The FCRA imposes a duty on consumer reporting agencies to devise and implement procedures to ensure the "maximum possible accuracy" of consumer reports, as follows:

> Whenever a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure *maximum possible accuracy* of the information concerning the individual about whom the report relates.

15 U.S.C. §1681e(b) (emphasis added).

132.    On numerous occasions, Defendants Equifax and Trans Union prepared patently false consumer reports concerning Plaintiff.

133.    Despite actual and implied knowledge that Plaintiff is not dead, Defendants Equifax and Trans Union readily sold such false reports to one or more third parties, thereby misrepresenting Plaintiff, and ultimately Plaintiff's creditworthiness.

134.    Defendant Equifax violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

135.    Defendant Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

136.    As a result of Defendants' conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; physical distress; sleepless nights; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

137.    Defendants' conduct, actions, and inactions were willful, rendering them each individually liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  Alternatively, they were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

138.    Plaintiff is entitled to recover attorneys' fees and costs from Defendants Equifax and Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for the following relief:

i.    Determining that Defendants negligently and/or willfully violated the FCRA;

ii.    Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

iii.    Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and,

iv.    Granting further relief, in law or equity, as this Court may deem appropriate and just.

## **DEMAND FOR JURY TRIAL**

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

RESPECTFULLY SUBMITTED this 26th day of September 2024.

By: */s/ McKenzie Czabaj*
McKenzie Czabaj, AZ Bar No. 036711
**CONSUMER ATTORNEYS PLC**
8095 North 85th Way
Scottsdale, Arizona 85258
Phone: (480) 626-2376
Fax: (718) 715-1750
Email: mczabaj@consumerattorneys.com

Shawn Jaffer (Local Counsel)
State Bar No. 24107817
**JAFFER & ASSOCIATES PLLC**
*Of Counsel to Consumer Attorneys PLC*
5301 Alpha Road, Suite 80-5
Dallas, Texas 75240-4355
Phone: (214) 945-0000
Fax: (888) 509-3910
Email: shawn@jaffer.law; attorneys@jaffer.law

*Attorneys for Plaintiff Christopher D. Johnson*